ARCTIC COMPANY, LTD. t/a Iroquois Research Institute, Appellant,

v.

LOUDOUN TIMES MIRROR; Kyle Parks; R. E. McDaniel, Appellees.

No. 79–1121.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1980.

Decided July 3, 1980.

H. Neil Garson, Fairfax, Va. (Daniel R. Kane, Washington, D. C., Michael A. Mays, Kenneth R. Weiner, Garson, de Member & Weiner, Fairfax, Va., Daniel R. Kane, Washington, D. C., on brief), for appellant.

Michael S. Horwatt, Reston, Va. (Thomas S. Kenny, Wyatt B. Durrette, Jr., Horwatt, Kenny, Glennon, Goodman & Schultz, Reston, Va., Chess, Durrette & Roeder, P. C., Fairfax, Va., on brief), for appellees.

Before FIELD, Senior Circuit Judge, and RUSSELL and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

This is an appeal by Arctic Co. Ltd. t/a Iroquois Research Institute (Iroquois) from the order of the district court granting summary judgment for the defendants in a libel action. The suit was brought against Loudoun Times Mirror (Mirror), a newspaper published in Loudoun County, Virginia, Carl Parks (Parks), a Mirror reporter, and R. E. McDaniel (McDaniel), an amateur archaeologist, and was based on an article written by Parks and published in the Mirror on September 14, 1978. The article concerned a proposed project on Lowes Island. Iroquois claimed that false statements in that article, attributed to McDaniel, had damaged its professional reputation.

The Fairfax County Water Authority, wishing to increase its water supply, sought a permit from the Army Corps of Engineers for construction of water intake facilities on Lowes Island, which is located in the Potomac River in the Loudoun County, Virginia area. The permit application required an inventory and evaluation of all known archaeological, historical, and architectural resources on Lowes Island and a plan to preserve the archaeological and historical resources. Iroquois, an independent company engaged in historical and archaeological research, was contacted in January, 1978 by the Water Authority to undertake this inventory and evaluation and design the mitigation plan. Iroquois had conducted numerous archaeological research projects for private business and other government agencies in various parts of the country and was performing work in seven different states on twenty different "cultural resource" assignments during the period in which it worked on Lowes Island. It commenced the project in January 1978, despite severe weather problems, and five months later, the project was completed with a report to the Water Authority. Iroquois was then hired for one additional month to prepare bidding specifications for management of the Island's resources. (The Water Authority's application was successful and the permit was subsequently granted.)

Lowes Island is an island of considerable historical and archaeological value. It is also the center of a considerable rezoning controversy. The impending acquisition of a large part of the island by a private developer, and the efforts of that developer to rezone the land for commercial use, had created considerable conflict among developers, citizens in the area, and history buffs.

As a result of this land development conflict the Mirror, in September 1978, assigned Parks to write a story on the archaeological explorations on Lowes Island. Parks, at the time of the assignment, knew nothing of Iroquois. After making inquiries among his colleagues at his newspaper, Parks was informed that McDaniel had a reputation as an archaeological expert. McDaniel was a United States Government employee and an amateur archaeologist. He had worked on Lowes Island pursuing his archaeological avocation and was known in the community as an authority on Lowes Island.[1] Parks interviewed McDaniel while he was engaged in archaeological explorations on Lowes Island. Parks' story based on the McDaniel interview was published in

---

1. Contrary to Iroquois' contentions, there is no evidence that McDaniel had been competing with Iroquois for the Fairfax County Water Authority contract.

the defendant Mirror on September 14, 1978. In the report Parks quoted McDaniel as saying, among other things:

"The Iroqois (sic) group was commissioned by the Fairfax County Water Authority which is building a water intake on the island."

"The Iroqois (sic) group did the work in February and had a deadline to meet. So instead of waiting for the earth to thaw, they went to work with jackhammers."

"'They recovered three or four artifacts by accident,' he said. 'They ignored any kind of settlement plan.'"

"It's not much of a plan at all, McDaniel thinks."

"'We had already covered the ground they did,' he said. 'They don't have a good reputation in archaeological circles. They cut corners.'"

After the publication of the article, McDaniel contacted the newspaper advising them that he had not made the statement concerning Iroquois' reputation. Thereafter, seven days later, on September 21, the defendant Mirror published a clarification:

"In a September 14 article on pg. C–1 entitled 'McDaniel: Archaeologist Against Bulldozers', one of R. E. McDaniel's quotes was unfortunately taken out of context.

McDaniel was describing the work of Iroquois Research Institute at Lowes Island when he said the Institution had a bad reputation and cut corners. McDaniel was only talking about the Institutes' work on the Island and not its general operations."[2]

John G. Lewis, a personal acquaintance of McDaniel and an authority on the history of Loudoun County and the county's representative to the Virginia Historical Landmarks Commission, wrote a letter on June 27, 1978, to the Corps of Engineers complaining about the quality of Iroquois' work. William M. McKelso, a commissioner of the Virginia Research Center for Archaeology, wrote the Water Authority on June 28, complaining that Iroquois' report contained insufficient information. He also stated that part of the research was not necessary because Iroquois had been given the results of McDaniel's archaeological research. Parks asserts in his affidavit that he became aware of this information during his preparation of the article.

The trial court found that Iroquois was not a public figure, but was a public official under the guidelines of *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) and could not recover in a libel action unless it proved actual malice or a reckless disregard for the truth on the part of defendants. The Court further held that, on the basis of the pleadings and the affidavits, there was no genuine issue of material fact concerning malice, and granted summary judgment for defendants.

Iroquois contends that it is neither a public figure nor a public official. Alternatively, it claims that defendant McDaniel's denial of the crucial statement attributed to him by the reporter created an inference that, if the news story was in part contrived, Parks "had serious doubts" about the veracity of that part of the story. This was sufficient proof of malice for jury consideration under the criteria of *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). It also contends that McDaniel competed with it professionally, creating a permissible inference of malice on his part. Thus, Iroquois argues that there exists material issues of fact as to malice, and summary judgment was inappropriate.

Defendants, on the other hand, contend that Iroquois is either a public figure or a public official and thus cannot recover unless malice on the part of defendants is proved by clearly convincing evidence. They claim that Iroquois' only counter-affi-

---

**2.** McDaniel, in his affidavit filed in connection with the motion for summary judgment, said in part:

"Mr. Parks misquoted me with respect to the statements alleged in paragraph 2 of plain-

tiffs' motion for summary judgment in that I did not say: 'They . . . (Iroquois) don't have a good reputation in archaeological circles. They cut corners.'"

davit in the summary judgment proceedings contained nothing indicating malice on the part of any defendant. Defendants believed that the Lewis and McKelso letters, together with the information received concerning the reliability of McDaniel, gave Parks a sufficient basis for writing the story, and demonstrate that there was no malice or reckless disregard for the truth.

Since we conclude that Iroquois is not a public official, we reverse the summary judgment. In view of our holding that Iroquois is a private person for libel litigation purposes, it is not necessary to reach plaintiffs' contention that there are material issues of fact as to the question of malice by defendants.

We agree with the trial court that Iroquois is not a public figure in the libel context. It was not generally known in the community—in fact the defendant news reporter only became aware of its identity during the preparation of the news story—and did not "press itself" into the public controversy over the use of Lowes Island. It merely performed a narrowly-defined professional service in a highly technical field. This background and activity does not fit the definition of a public figure. *See Wolston v. Reader's Digest Association,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

Neither is Iroquois a public official under the law of libel. *New York Times v. Sullivan,*[3] in requiring proof of malice by a public official libel plaintiff, was silent as to the inclusiveness of that category. Two years later, however, the court in *Rosenblatt v. Baer*[4] directly considered the term. Justice Brennan, writing for the majority, explained:

> [T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs . . . [footnote omitted].
>
> . . . Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the *New York Times* malice standards apply . . . [footnote omitted].

*Id.* at 85–86, 86 S.Ct. at 676.

> It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.

*Id.* at 87 n. 13, 86 S.Ct. at 676.

The *Rosenblatt* characterization of a *New York Times* public official has not been modified and in our view fits well into the framework of competing values created by libel litigation. Testing Iroquois' status under the criteria of *Rosenblatt,* we conclude that it has not relinquished its status as a private business enterprise by entering into the type of government and political activities that would set it apart as an entity that must be closely scrutinized by the press.

Iroquois was employed as a consultant by the Fairfax County Water Authority for two periods lasting a total of six months. Its role was solely that of a scientific fact-finder, merely reporting to its principal, the Water Authority, the archaeological facts

---

3. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

4. 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

as found. It had no control over the conduct of government affairs. It made no recommendations, participated in no policy determinations, and exercised no discretion. Its position was not of such apparent importance that the public has an independent interest in its qualifications beyond the general interests in the qualifications and performance of all government employees or consultants. Iroquois' position invited public scrutiny and discussion only insofar as it became part of the discussion occasioned by the unrelated controversy involving the rezoning of Lowes Island. While the proposed water intake facility did cause concern among some citizens in the area, such as members of the Virginia Historic Landmarks Commission, the principal controversy, and the impetus for the controverted article, remained the question of the commercial development of Lowes Island.

There well may be circumstances in which a consultant employed by a government entity could be classified as a public official. We can perceive no rationale, however, under which Iroquois should lose its status as a private business enterprise. Even had it been a permanent Water Authority employee, it is doubtful that Iroquois could have been classed as a public official under the *Rosenblatt* standards. Its internal structure as a consultant available to business and government alike, the short duration of its employment, its function as purely a fact-finder exercising no judgment or discretion mitigate further against Iroquois' classification as a public official.

We therefore reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*